UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:

Case No. 25-BR-74838-las

INCOME ADVANTAGE FUND, LLC,
*Debtor*.
-------------------------------------------------------------X
-------------------------------------------------------------X
In re:

Case No. 25-BR-74839-las

INCOME ADVANTAGE FUND II, LLC,
*Debtor*.
-------------------------------------------------------------X

DEBTORS VERIFIED DECLARATION AND OPPOSITION TO
CREDITORS' CHAPTER 7 INVOLUNTARY BANKRUPTCY PETITION

PRELIMINARY STATEMENT

Debtors Income Advantage Fund, LLC and Income Advantage Fund II, LLC (hereafter collectively referred to as "Debtors" or "IAF"), by and through their counsel Langone and Associates, PLLC, and Verified by their current Managing Member (Christopher Hummel), submit this Declaration and Opposition to contest both the Creditors petition for Chapter 7 Involuntary Bankruptcy relief and the motion for appointment of an Interim Trustee ("Creditors"). *See* Bankruptcy Rules §§ 303, 1011. Christopher Hummel (C.P.A. and MBA), and former Managing Member Dennis Hummel (C.P.A.), have acted with prudence, transparency, and consistent with their obligations to protect the rights and interests of the Creditors. Since both Hummels are C.P.A.s and Chris has an MBA from N.Y.U. (Stern School of Business), they are certainly qualified to protect the Creditors interests and, as will be established herein, have done so tirelessly.

## STATEMENT OF FACTS

1. Curtis Luckman was a flamboyant and highly successful businessman. He was a lawyer, a C.P.A., and a licensed Series 7 stock trader. His friends called him "Lucky" and "Luck." He drove fancy cars.

2. In October, 2012, Curtis created IAF to work with a company named Law Fund, LLC, that was in the business of making hard-money loans to law-firms for litigation funding purposes. IAF's job was to find people to invest in the Fund.

3. Curtis was 80-percent owner of IAF; Dennis Hummel was 10-percent owner; and Christopher Hummel – Dennis' son – was 10-percent owner.

4. Managing Member Christopher Hummel invested in the IAF-II Fund (for an 8% return); his adjusted basis (i.e., money owed to him) is $1,010,000.00.

5. Former Managing Member Dennis Hummel invested in the IAF-II Fund (for an 8% return); his adjusted basis (i.e., money owed to him) is $639,900.

6. In April 2013, Curtis created IAF-II to work with a company named ARDEC that was also engaged in litigation funding.

7. Trusting Curtis' business acumen, his family and friends invested in the Fund and became Noteholders. The hard-money loans to ARDEC were typically 12-percent, while the loans to Law Fund had variable and sometimes higher rates. Noteholders typically earned 8-percent, while the remainder was profit for IAF and/or IAF-II.

8. From 2012 until 2020, everyone made money, and interest payments were made on time. But in 2020, the COVID-19 pandemic struck; and for the next two

years, by Order of Governor Andrew Cuomo, all litigation was placed on hold. But with interest kept accruing at 8-percent interest, the Noteholder' money doubled every nine years. Unable to keep up with the interest payments, Curtis exercised his right under the Offering Memorandum to invest Noteholder funds in the stock market (an alternative and potentially lucrative money-making option). *See* "Offering Memorandum" – "Use of Proceeds":

> The Company reserves the right to use the funds obtained from this Offering for other similar purposes not presently contemplated which it deems to be in the best interest of the Company and its Noteholders in order to address changed circumstances or opportunities. As a result of the foregoing, the success of the Company will be substantially dependent upon the discretion and judgment of Management with respect to application and allocation of the net proceeds of this Offering. *Investors of the Promissory Notes offered hereby will be entrusting their funds to the Company's Management, upon whose judgment and discretion the investors must depend* (Offering Memo, p. 16; annexed to motion for Interim Trustee, at Pet. p. 29) (emphasis added).

*Accord,* Offering Memo., p. 8; Pet. p. 21 ("The Company has the right to alter any criteria if it is in the best interest of the Company and its Noteholders"); Offering Memo, p. 16; Pet. p. 29 ("Unanticipated Obstacles to Execution of the Business Plan" – "Management reserves the right to make significant modifications to the Company's stated strategies depending on future events").[1]

[1] Petitioners concede the Noteholders funds could be used for purposes other than hard-money lending, as the Debtors' business was "*primarily* [but not entirely] to provide short-term, secured advances to personal injury attorneys and litigation funding entities . . ." (Offering Memo, ¶12; Pet. p. 5).

9. In May 2025, the Securities and Exchange Commission ("SEC") initiated a private investigation to determine whether any persons and/or entities engaged in possible violation of federal securities law and issued subpoenas to the Debtors.

10. The Debtors retained the law firm Morritt Hock & Hamroff, LLP, to represent them along with the Members of IAF and IAF-II.

11. Contrary to Petitioner's allegations, the SEC has made no determination that any such violations occurred; and there is nothing to suggest that any other governmental agency, including any prosecutor's office, is investigating the Debtors or their principals. Notably, the SEC has not issued a Wells Notice of SEC's intent to recommend enforcement action to the Commission; nor has the SEC taken steps to stop Debtors from operating.

12. The Debtors through their attorneys responded to the subpoenas on June 26, 2025, and have supplemented their initial production. There has always been full compliance.

13. Former Managing Member Dennis Hummel diligently retained counsel who employed the services of Renaissance Associates, a forensic accounting firm, to conduct a full audit of the Debtors' books and records, including bank and other financial statements, to assist the SEC investigation. The factually detailed Declaration of John La Perla enlightens on how really hard the Hummels have been working to help the Noteholders recoup their money. *See Exhibit A* (Dec. John LaPerla). The Debtors and the Hummels collectively paid Renaissance Associates $136,350.00 for an in-depth forensic analysis.

14. Upon information and belief, Curtis sent a letter to the Noteholders advising them that as of June 30, 2025, interest would no longer be paid on the Notes due to changed economic conditions caused by business slowdown.

15. On August 12, 2025, Curtis sent a letter to all Noteholders informing them that the SEC had opened an investigation into IAF-I and IAF-II. *See Pet.,* p. 40.

16. Curtis died of cancer on September 30, 2025, just days before his scheduled SEC testimony.

17. Following Curtis' death, Moritt Hock & Hamroff resigned as counsel for Debtors and was replaced by Langone & Associates, PLLC and its principal Richard M. Langone. Notwithstanding Petitioners' attempt to bias this Court against Chris Hummel, Attorney Langone was not retained in his capacity as a criminal defense attorney; rather, he was retained to represent Chris in an SEC administrative investigation. Mr. Langone's website specifically states that he has an LLM degree in commercial law and taxation.

18. On October 16, 2025, Christopher Hummel became Managing Member of the Debtors.

19. Contrary to the Petitioners claim that the Hummels are not acting in their best interest, Managing Member Christopher Hummel has already negotiated a favorable settlement with Law Fund to repay all amounts due to IAF and IAF-II within the next 12 months; the terms were set-forth in an email to Attorney Langone from Elyse Gottschalk of Law Fund sent on December 11, 2025:

> As discussed, typically there would have been much more of a runway and communication regarding a payoff of this magnitude. We

acknowledge that there are special circumstances at play here. To be clear, this proposal is only possible because we can pledge the IAF collateral to our other lender and draw upon that facility to pay IAF. As discussed, delivery of a notice of default from IAF to Lawfund would make it impossible for us to do so.

As of 11/30, the outstanding balance on the credit facility (inclusive of interest) is **$17,097,995.56**. Separately, there is a pool of plaintiff loans (i.e., the IAF "old collateral") with a principal balance of **$557,753.57** (as of 11/30), in respect of which IAF and Lawfund share in litigation proceeds pursuant to a separate profit share agreement. For purposes of the below proposal, we're ascribing a value of $750,000 to IAF's interest under the profit share agreement, resulting in total obligations to IAF of **$17,847,995.56.**

In respect of the **$17,847,995.56** in total obligations, Lawfund proposes the following:

1. The maturity date for the IAF loan is extended to January 15, 2026
2. On January 15, Lawful will pay IAF $13,000,000 in cash

3. On January 15, Lawfund will deliver a 1-year promissory note to IAF for $4,847,995.56

1. Annual interest of 15%

2. Monthly amortization in accordance with the below amortization schedule

*See Exhibit B* (email correspondence memorializing terms and conditions tentatively agreed to).

20. Contrary to Petitioners claims that the Hummels have not been keeping in touch with Noteholders, Managing Member Christopher Hummel (and his counsel) did in fact send several letters to, and has had multiple communications with, the Noteholders apprising them of everything that he has been doing to get them back every dime he can. *See Exhibit C* (Letters to Noteholders). Moreover, the Hummels

and their counsel have been fielding a daily barrage of phone calls and emails from Noteholders keeping them apprised of the situation.

21. The SEC investigators have been advised both orally and in writing on several occasions on the methodology the Debtors intend to employ in order repay to each Noteholder based on his or her adjusted principal and proportionate basis in the Fund. *See Exhibits C & F.*

22. Debtors have provided copies of the bankruptcy petition and motion for appointment of an Interim Trustee to the SEC (and will transmit this Declaration and Opposition once it is filed).

23. For the past six months neither Christopher Hummel nor Dennis Hummel have taken a penny in salary from Debtors' bank account; every penny has been spent on either paying the Debtors' bills and distributions to Noteholders. Just in the past sixty days, Debtors have disbursed more than $3 million dollars in repayment of principal to the Noteholders. *See Exhibit D* (six months Debtor bank statements).

24. Note that Noteholders Robert and Sharon Lobel (husband and wife), two of the Declarants who support bankruptcy, brought a lawsuit in the State of New York, Nassau County, suing both the Debtors and Christopher and Dennis Hummel personally, and making virtually the same false and/or specious allegations that constitute the gravamen of this bankruptcy petition. The allegations were refuted in an Answer that averred:

> [6] Defendant Christopher Hummel was not the Managing Member of either IAF-I or IAF-II during any of the dates of wrongdoing alleged in the Complaint. On the contrary, up until the time of his death, Curtis Luckman maintained full *exclusive* control over the activities and

finances of both IAF-I and IAF-II, and maintained full and exclusive custody and control of the business records of those entities which he kept at an offsite location that neither Christopher Hummel nor defendant Hummel had access to;

[7] Defendant Christopher Hummel never knowingly provided assistance to Curtis Luckman or anyone else in any of the fraudulent and embezzlement activities alleged in the Complaint;

[8] Defendant Christopher Hummel did not breach any fiduciary duty owed to the Noteholders;

[9] Defendant Christopher Hummel never acted recklessly or with gross negligence; and he did not know that the late Curtis Luckman had used Noteholders' money to engage in risky futures trading in the stock market;

[10] Defendant Chris Hummel never met or spoke with plaintiffs Robert Lobell and Sharon Lobel to induce them into lending money to IAF-I or IAF-II for any purpose.

*See Lobel v. IAF, et al.* (Index No. 624618/2025). The Petition for bankruptcy studiously ignores the fact that in two separate proceedings both the *nisi prius* and the Appellate Division denied the Lobels' emergency motions for a TRO, rejecting nearly the same claims being made in this bankruptcy proceeding. The law firm Ruskin Moscou represents the Lobels both in state court and in this Court. *See Exhibit E* (Orders denying requests for Emergency TROs).

25. Like the Lobels who support bankruptcy, Noteholder Robert Fisse also has sued the Debtors and Dennis Hummel personally, and makes virtually the same specious allegations that constitute the gravamen of this bankruptcy petition. Those allegations, too, were refuted in an Answer that averred:

[8] Managing Member Dennis Hummel did not knowingly provide substantial assistance to Curtis Luckman in any of the alleged fraudulent and embezzlement activities alleged in the Complaint;

> [9] Managing Member Dennis Hummel did not breach any fiduciary duty he may have owed to the Noteholders;
>
> [10] Managing Member Dennis Hummel did not act recklessly or with gross negligence by not knowing the alleged financial losses caused by Curtis Luckman using Noteholders' money to engage in risky futures trading in the stock market;
>
> [11] Managing Member Dennis Hummel never met nor spoke with plaintiff Robert Fisse; and,
>
> [12] Managing Member Dennis Hummel never met nor spoke with CPA Gabriel Castillo.

*See Fisse v. IAF-II et al,* (Index No. 622368/2025). Note that Attorney Langone had an hour-long conversation on the telephone with Mr. Fisse and his attorney Daniel E. Shapiro, of Ruskin Moscou, during which the terms of the settlement agreement were thoroughly discussed. Attorney Langone has had numerous phone calls and email messages from Noteholders and explained to each one of them the terms about financial settlement with Law Fund.

26. In both the Lobels and Fisse lawsuits, Debtors have preserved the Noteholders rights to recoup their losses by cross-claiming against the Estate of Curtis Luckman on grounds of breach of fiduciary duties and for indemnification, and by sending a Litigation Hold letter to the attorney for Curtis Luckman's estate. *See Exhibit F*

27. Petitioners/Declarants claim no correspondence or payment was sent to Noteholders as of the time of the filing of the bankruptcy petition on December 18, 2025. In fact, letters to Noteholders with return of principal totaling approximately

$3 million dollars were dropped off at the post office on December 10, 2025. Most likely, the Noteholders received the mailings before December 18th.

28. Contrary to Petitioners/Declarants claims that there has been no accounting for their funds, the Debtors had a full-blown financial analysis conducted. *See* Exhibit A. John La Perla's detailed Declaration demonstrates precisely how hard the Hummels have been working to help the Noteholders recoup their money.

29. Contrary to Petitioners claim that they were falsely led to believe that hard-money lending was a safe or relatively "low risk" venture (Dec. Lobell, ¶ 9), the Offering Memorandum and its cover letter to prospective Noteholders made those risks abundantly clear:

> THESE ARE SPECULATIVE SECURITIES WHICH INOVLVE A HIGH DEGREE OF RISK. ONLY THOSE INVESTORS WHO CAN BEAR THE LOSS OF THEIR ENTIRE INVESTMENT SHOULD INVEST IN THESE NOTES (Pet, p. 14).
>
> * * * *
>
> Each prospective investor should carefully review the Memorandum and all associated Exhibits before purchasing Notes. Management makes no representations as to the accuracy or achievability of the underlying assumptions and projected results contained herein" (Pet. P. 22, Memo, p. 9). "In light of the risks, assumptions, and uncertainties involved, there can be no assurance that the forward-looking information contained in this Memorandum will in fact transpire or prove to be accurate" (Offering Memo. pp. 13-14 [Development Stage Business]; Pet. P. 26).

30. There are currently 65 Noteholders. Only 24 Noteholders are named in this Petition. *Compare* list of current Noteholders with the list of Creditors who signed bankruptcy petition. *See Exhibit G* (List of Noteholders and their contributions).

31. Due to severe time constraints and the holidays, Debtors have not had time to reach out to the remaining Noteholders for a complete tally. But the fact that

Petitioners have not named the remaining Noteholders suggests that either they were not asked to join the bankruptcy petition or simply said no.

32. In any event, the Noteholders who invested the most cash into the Debtors' Funds have come forward *on their own* in opposition to placing Debtors into bankruptcy. *See Exhibit H* (Declarations of Noteholders with the largest vested interests in the Funds). They oppose bankruptcy because it would be (a) more cost efficient and (b) speedier for them to get back the remaining principal simply by allowing the current Managing Member Christopher Hummel to finalize the settlement agreement he has already made with Law Fund to obtain all the monies owed to the Debtors within the next twelve months. *See Exhibit B.*

## POINT I

**Public policy and economic efficiency militate in favor of dismissal of the involuntary Chapter 7 petition, since the interests of the creditors would better be served by obtaining the money owed to them outside of bankruptcy**

There are currently 65 Noteholders. Only 25 are named in this Petition. The vast majority oppose proceeding via bankruptcy for various reasons, including the belief that neither Curtis Luckman nor the Hummels ever intended to steal from them; and because bankruptcy would be slowest and least cost-efficient way to proceed. A full accounting has been completed and was vetted by the SEC. In the past month, Managing Member Chris Hummel has disbursed more than $3 million dollars to the Noteholders. And he is close to finalizing a settlement with Law Fund whereby the Noteholders will receive a total of at least $17,847,995.56 within the next 12 months. Since there is not even an allegation that Chris Hummel has ever done

anything wrong to the Noteholders – on the contrary, he has done everything right – it would be in everyone's best interest to allow Chris to continue winding down the Debtors and to ultimately decide (with the other members) whether or not to dissolve the companies. The Debtors have already spent $136,350.00 for the cost of the on-going SEC investigation. There is no need to duplicate the expenses already incurred or to vastly add the time to resolve this matter if it is forced to proceed via bankruptcy.

Other reasons the majority Noteholders do not want their claims resolved via bankruptcy are: (a) administrative expenses under 11 U.S.C. § 503(b) receive priority payment, which can reduce distributions to unsecured creditors; and (b) once bankruptcy commences, creditors lose their ability to pursue individual collection remedies due to the automatic stay. The bankruptcy priority system will disadvantage certain creditors who would fare better outside bankruptcy.

Bankruptcy policy "strongly favors the 'speedy, inexpensive, negotiated' adjustment of creditor-company relations afforded by out-of-court (workouts and settlements." *In re: Genco Shipping & Trading Limited* , 509 B.R. 455 (S.D.N.Y. 2014). Hence, under 11 U.S.C. § 305(a), this Court may dismiss a case "if the interests of creditors and the debtor would be better served by such dismissal or suspension." *In re Grigoli* , 151 B.R. 314 (E.D.N.Y. 1993), the late (and great) Judge Duberstein held that "if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment," then "the less expensive out-of-court

workout may better serve the interests in the case." *See also, In re Audio Visual Workshop, Inc.,* 211 B.R. 154 (S.D.N.Y. 1997), where the court dismissed an involuntary petition where "the majority of creditors opposed involuntary bankruptcy case" and where the "bulk sale was less expensive arrangement which best served all interests in case."

Finally, the bankruptcy petition should be dismissed because each Noteholders claim must still be adjusted to reflect previous distributions received in order to arrive at an adjusted basis to derive what each Noteholder's proportionate share of the Fund will be. Hence, the claims are not fixed, liquidated, or undisputed, which are necessary conditions to the Noteholders/Creditors right to elect a permanent Trustee under Bankruptcy Rule 303(g).

In sum, contrary to any false claim that the Hummels have been acting in self-interest, the detailed Declaration of John La Perla, along with the imminent settlement with Law Fund to get the Noteholders every penny due to IAF and IAF-II within the next 12 months, are proof positive that the Noteholders interests are being protected. For all the foregoing reasons, the involuntary bankruptcy petition should be dismissed.

## POINT II

## There is no need to appoint an Interim Trustee because the Hummels have done nothing wrong and the SEC is fully informed

The appointment of an Interim Trustee is appropriate only when necessary to "preserve the property of the estate or to prevent loss to the estate." 11 U.S.C. § 303.

Here, Petitioners proffer several reasons why it is vital for immediate appointment of an Interim Trustee. None of those reasons has merit:

1. Ongoing SEC investigation (Pet. p. 2).

The SEC is fully aware of what Debtors are doing and have stated no objection. The SEC has the bank statements and all the other records which they requested. The SEC is fully aware of the method the Funds are employing to make the Noteholders as whole as possible; specifically, since there is a shortfall and the Funds cannot pay principal plus interest, the goal has been to get back each creditor as much of the principal as possible by recharacterizing interest payments previously received as a return of principal and reducing their basis in the Fund accordingly. The Funds notified the SEC staff of this methodology. The SEC did not object and has made no attempt to stop Debtor from following through on the planned distribution of Funds. *See* 15 U.S.C. § 78u (SEC may seek injunctive relief when "any person is engaged or about to be engaged in any acts or practices which constitute a violation" of securities laws); *accord, S.E.C. v. Matera,* 745 F.2d 197 (2d Cir. 1984) (acknowledging SEC authority to obtain equitable relief). The lack of SEC action may indicate that even its staff understands that the most efficient means of returning funds to Noteholders is through the current plan and without governmental intervention.

2. Evidence of Fraudulent Transfers to Curtis (Pet. pp. 2, 8 ¶ 25)

Petitioners have suggested that Dennis Hummel made fraudulent transfers to Curtis. In fact, Curtis wrote checks on behalf of himself and signed Dennis Hummel's name to them. Dennis never authorized Curtis to use Noteholder funds to invest in

the stock market. Curtis signed Dennis' name because Curtis ran the Debtor companies from his house where he kept virtually all the business records. Curtis was 80-percent owner of IAF and IAF-II; as such, he was entitled to receive 80-percent of the net profits (which was 3.2-percent interest on the principal amount) and frequently took draws. Moreover, during the times these checks were written, the Debtors were solvent. Without knowing why the checks were issued or the source of those funds (was it Noteholder money or was it Curtis's money?), it is woefully unfair to surmise that the checks are evidence of fraud.

3. Reckless Conduct in Violation of the Offering Memorandum

As stated, the Offering Memorandum allowed the Debtors to invest the Funds in different markets if adverse economic conditions warranted it. Managing Member Christopher Hummel agrees that Curtis acted recklessly by initially investing in highly risky stock trades, and then by doubling down on his bets in a misguided effort to recoup the losses, to everyone's detriment: Chris has $1,010,000.00 at risk; and Dennis has $639.900.00 at risk due to the debacle. But Curtis's misfeasance is on him; the Hummels had nothing to do with it and did not know what Curtis was doing with the Funds. *See* New York Limited Liability Law § 412 (LLC not liable for torts committed by Member who acts *ultra vires* and without authority). As stated, two Noteholders have sued the Debtors and the Hummels; in both cases, the Debtors and the Hummels have cross-claimed against the Estate of the late Curtis Luckman for both breach of fiduciary duty and for indemnification.

4. There is No Reason to Believe any Funds "May Go Missing"

Petitioners' allege without basis that they are worried the money that Managing Member Christopher Hummel has arranged to get back for the Noteholders may be stolen. They learned that from Chris Hummel who told them about it and even provided them with the settlement terms. Again, the SEC has every business record, bank statements, emails, text messages, and invoices. The SEC knows the Debtors' entire financial picture and would likely intercede in an instant if they suspected anything improper or wrong was taking place. But the SEC has not issued a Wells Notice or taken any steps to stop Debtors from operating or recovering money owed to the Funds' for distribution to Noteholders.

5. There is No Basis to Find that Debtors are "participating in ongoing fraud to the detriment of their investors"

Petitioners know this claim is a bald face lie. Noteholders Robert and Sharon Lobell recently made the same frivolous claims against Christopher and Dennis Hummel in Supreme Court, Nassau County (Index No. 624618/2025). In that lawsuit, brought by Ruskin Moscou (the same law firm who brought the bankruptcy petitions), the gravamen of the complaint was that Curtis and Linda Luckman named their close friend Robert Lobell as trustee on the Luckman's marital residence that was placed in a trust (likely for estate tax planning purposes). Linda wanted Mr. Lobell to transfer the house out of the trust and into her name. Mr. Lobell refused and then bought a lawsuit claiming that Linda Luckman was trying to defeat the rights of creditors who he knew would be suing Curtis' estate for the money he lost allegedly gambling with their money. The Complaint further alleged that both Dennis Hummel and Christopher Hummel conspired with Curtis to do it, but utterly failed to provide

even a scintilla of probative evidence to support that claim. Accordingly, Messrs. Lobels' emergency motion for a temporary restraining order was denied. *See Exhibit G* (Orders Denying Emergency TROs).

As stated, the attorneys for Ruskin Moscou then filed an emergency motion for a TRO in the Appellate Division. At the meeting with a Justice's law clerk, I told attorneys Daniel E. Shapiro that I had no objection to a TRO against Linda Luckman to prevent her from transferring the house out of the trust, but that I would never agree to a TRO against either Christopher Hummel or Dennis Hummel, because they did nothing wrong. Mr. Shapiro told me, in the presence of the Justice's law clerk, that he had no problem with omitting them from the TRO. Despite my concession, the Appellate Division denied the TRO for failing to meet the stringent standards for obtaining that extraordinary relief. Yet, here comes the same Noteholders again with the same counsel (Ruskin Moscou), raising the same (and more) frivolous claims against the Hummels. The circumstances have not changed. The bankruptcy petition fails to allege anything Chris Hummel did wrong; instead, they rely on weak circumstantial evidence in alleging that Dennis signed checks from Debtors bank account(s) – that Dennis neither filled out nor signed. Clearly, the standard for appointment of an Interim Trustee has not never been me – and it is still not met. *See Exhibit E* (Orders denying TROs).

CONCLUSION

FOR ALL THE FOREGOING REASONS, THE NOTEHOLDERS PETITION FOR INVOLUNTARY CHAPTER 7 SHOULD BE DISMISSED AND THE MOTION FOR AN EMERGENCY INTERIM TRUSTEE SHOULD BE DENIED, AND GRANT SUCH OTHER AND FURTHER RELIEF THE COURT DEEMS JUST AND PROPER.

Dated: Garden City, New York
December 2, 2026

Respectfully submitted by,

LANGONE & ASSOCIATES, PLLC
Attorneys for the Debtors and Christopher Hummel

By: *Richard M. Langone*
RICHARD M. LANGONE
600 Old Country Rd (STE 328)
Garden City, New York 11530
516.795.2400; rich@rlangone.com

Cc: All Parties
(Service by ECF)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
In re:

Case No. 25-BR-74838-las

INCOME ADVANTAGE FUND, LLC,
*Debtor.*
---------------------------------------------------------------X
---------------------------------------------------------------X
In re:

Case No. 25-BR-74839-las

INCOME ADVANTAGE FUND II, LLC,
*Debtor.*
---------------------------------------------------------------X

VERFICIATION

STATE OF NEW YORK)
COUNTY OF NASSAU )

CHRISTOPHER HUMMEL, being duly sworn, deposes and says:

I have perused the within "Verified Declaration and Opposition to the Creditors Chapter 7 Involuntary Bankruptcy Petition" etc., know the contents therein to be true based upon personal information, and based upon information and belief, the sources of which matters I believe them to be true.

___________________________
CHRISTOPHER HUMMEL